# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SCOTT R. WITZKE,           *

    *Plaintiff*,           *

    v.           *        Civil No. RDB-17-0651

PEPSI BOTTLING VENTURES, LLC,  *

    *Defendant*.         *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiff Scott Witzke ("Plaintiff" or "Mr. Witzke") alleges that his former employer, Defendant Pepsi Bottling Ventures, LLC ("Defendant" or "PBV"), terminated his employment because of his age. Plaintiff's Complaint (ECF No. 1) asserts one count of age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*

Pending now are Defendant's Motion for Summary Judgment (ECF No. 23) and Plaintiff's Motion for Leave to File a Reply (ECF No. 33). The parties submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons set forth below, Plaintiff's Motion for Leave to File a Reply (ECF No. 33) is GRANTED,[1] and Defendant's Motion for Summary Judgment (ECF No. 23) is GRANTED. Accordingly, Judgment shall be ENTERED in favor of the Defendant.

---

[1] In this motion, Plaintiff merely seeks to amend the signature page on a previously filed Affidavit (ECF No. 26-8). Having shown good cause and the absence of prejudice to the Defendant, Plaintiff's motion is GRANTED.

# BACKGROUND

## I.    Plaintiff's Work History

Mr. Witzke began working for Pepsi Bottling Company of Salisbury in June 1984. (Pl. Dep. at 15-16, ECF No. 23-7.) In August 2004, Pepsi Bottling Ventures, LLC ("PBV") purchased Pepsi Bottling Company of Salisbury, and Mr. Witzke began working for PBV at that time. (*Id.* at 18.) PBV manufactures, sells, and distributes Pepsi-Cola beverages and other products at multiple East Coast locations. (Niver Decl. ¶ 7, ECF No. 23-6.) Mr. Witzke worked out of Salisbury, Maryland, which is the headquarters of PBV's Northern Division. (Tull Decl. ¶¶ 7-8, ECF No. 23-2.) At all times, Mr. Witzke was employed at-will. (Pl. Dep. at 20-22, ECF No. 23-7; Def. Ex. H at 6, ECF No. 23-8; Tull Decl. ¶ 8, ECF No. 23-2.)

Mr. Witzke worked primarily in sales positions throughout his PBV employment, working as a Food Service Representative ("FSR") from 2009 through the end of his PBV employment. (Pl. Dep. at 18-19, ECF No. 23-7; Tull Decl. ¶ 8, ECF No. 23-2.) As an FSR, Mr. Witzke was responsible for sales and service to Food Service accounts, including restaurants, casinos, and establishments. (Pl. Dep. at 19-20, ECF No. 23-7; Def. Ex. H at 2, ECF No. 23-8; Tull Decl. ¶ 9, ECF No. 23-2.) Mr. Witzke received positive performance reviews for years. (*See* Witzke Performance Reviews, Pl. Ex. 1, ECF Nos. 26-1 to 26-3.)

Throughout the course of his employment, Mr. Witzke was supervised by David Goslee, the Food Service Director for the Northern Division. (Pl. Dep. at 18-19, ECF No. 23-7; Goslee Decl. ¶ 5, ECF No. 23-5.) Mr. Goslee reported to both Mike Wood, Division Sales Director for PBV's Northern Division, and to Randy Quirk, Vice President of Food Service based out of PBV's corporate headquarters in Raleigh, North Carolina. (Quirk Decl.

¶¶ 5-7, ECF No. 23-4; Wood Decl. ¶ 4, ECF No. 23-3.) During the relevant time period, Mike Tull was the HR Manager for the Northern Division. (Tull Decl. ¶ 5, ECF No. 23-2.) Mr. Tull reported both to Mr. Wood and Claire Niver, PBV's Vice President of Human Resources and Corporate Affairs based out of the Raleigh corporate headquarters. (*Id.* at ¶ 6; Niver Decl. ¶¶ 4-6, ECF No. 23-6.)

In 2015, PBV implemented a Customer Relationship Management Software ("CRM") to provide an electronic method for collecting, preserving, and sharing customer-related information, referred to as "tribal knowledge." (Quirk Decl. ¶ 27, ECF No. 23-4.)

## II.     Plaintiff Turns 50 Years of Age

On or about June 18, 2015, Mr. Goslee commented that he "had a lot of gray hair in the department" and "feels they are becoming complacent." (Pl. Dep. at 91-93, ECF No. 23-7.) In August of 2015, Mr. Witzke informed PBV that he needed surgery for abdominal lumps. (Pl. Dep. at 87-90, 235-236, ECF No. 23-7.) On or about September 24, 2015, shortly after Mr. Witzke turned 50, Goslee commented that Mr. Witzke "was beginning to look weathered." (*Id.* at 94-96.)

## III.    Sales Incentive Program by Dr. Pepper Snapple Group

While PBV sells and distributes Pepsi-Cola products, it also sells and distributes products by the Dr Pepper Snapple Group ("DPSG"). (Pl. Dep. at 40, 44, ECF No. 23-7.) From November 2, 2015 to February 19, 2016, PBV participated in a sales incentive program sponsored by DPSG (*Id.* at 39-40; Tull Decl. ¶ 14, ECF No. 23-2.) Under this incentive program, the PBV FSR who added the most new fountain valves for DPSG products would win a trip to Las Vegas to see the Academy of Country Music Award ("ACMA") ceremony. (Pl. Dep. at 40, ECF No. 23-7; Tull Decl. ¶ 16, ECF No. 23-2.) For

example, if an FSR persuaded a customer to install a new fountain using DPSG products at an account that did not previously have a fountain, the FSR would be credited with new fountain valve placement. (Tull Decl. ¶ 18, ECF No. 23-2.)

Fountain beverages are made with a combination of water and product syrup (referred to as "BIB" or "Bag in Box"). (Pl. Dep. at 44, ECF No. 23-7; Tull Decl. ¶ 20, ECF No. 23-2.) PBV tracked new fountain valve placement for DPSG products by maintaining data showing when BIB for DPSG products had been ordered at an account that had not previously ordered BIB for DPSG products. (Tull Decl. ¶ 20, ECF No. 23-2.) Such an order suggested that a new valve placement had been made. (*Id.*)

## IV. The Harrington Order and Plaintiff's Termination

Mr. Witzke was responsible for sales to the Harrington Raceway & Casino ("Harrington"), one of PBV's largest customers in the Northern Division. (Pl. Dep. at 40, ECF No. 23-7; Tull Decl. ¶¶ 10, 21, ECF No. 23-2.) Harrington's operations include a harness racing track, casino, and multiple locations with beverage service. (Pl. Dep. at 41, ECF No. 23-7; Tull Decl. ¶ 22, ECF No. 23-2.) Harrington therefore had several separate accounts with PBV, including a restaurant called BONZ, a Gift Shop, a convenience store called Grab-n-Go, an Employee Breakroom, a VIP lounge called the Black Diamond Lounge, and three separate Casino accounts. (Pl. Dep. at 41-42, ECF No. 23-7; Tull Decl. ¶ 23, ECF No. 23-2.) Some of these accounts did not have fountains or use BIB, including Grab-n-Go and the Gift Shop. (Pl. Dep. at 45, 47, 49, ECF No. 23-7; Tull Decl. ¶ 23, ECF No. 23-2.)

D.J. Silicato was the Executive Director of Food and Beverage for Harrington, and he was one of Mr. Witzke's primary contacts at Harrington. (Pl. Dep. at 42, ECF No. 23-7;

Tull Decl. ¶ 24, ECF No. 23-2.) Mr. Witzke informed Silicato of the DPSG incentive program and discussed the possibility of adding on new valves of product. (Pl. Dep. at 67-68, ECF No. 23-7.) On February 4, 2016, Silicato placed an email order (the "Order") for DPSG BIB with Sandy Morris, PBV's Distribution Manager. (Def. Ex. H at 14, ECF No. 23-8; Tull Decl. ¶ 25, ECF No. 23-2.) The Order requested BIB for multiple Harrington accounts to be delivered on February 9. (*Id.*)

On February 8, 2016, Ms. Morris forwarded the Order to Mr. Witzke and Mr. Goslee. (Def. Ex. H at 14, ECF No. 23-8.) She explained that she thought the Order was "strange" because: (i) it included an order for BIB for accounts that do not have fountains or use BIB, and (ii) it requested that the BIB for those accounts be delivered to the "pump-room" rather than to the account locations. (*Id.*) A few minutes after receiving Morris's email, Mr. Witzke responded, stating, "It [sic] all good. Let's send them." (*Id.* at 17.)

On February 11, 2016, Jenny Mead, a Promotions Supervisor with Harrington, sent an email to Ms. Morris, asking PBV to pick up the DPSG BIB that had been delivered to the Black Diamond Lounge because she believed it had been sent by mistake. (*Id.* at 21.) In response, Morris explained to Mead, copying Mr. Witzke and others on the email, that PBV would not pick up the BIB because it had been special ordered by Silicato. (*Id.* at 20.) Silicato then responded, confirming that he placed the order and stating that the BIB at issue was supposed to have been delivered to the pump-room. (*Id.*) Ms. Morris forwarded the foregoing emails to Mr. Wood, who forwarded them to Mr. Tull. (Tull Decl. ¶¶ 27, 32, 33, ECF No. 23-2; *id.* at 20-27; Wood Decl. ¶¶ 8, 12, 15, ECF No. 23-3.) In forwarding the

emails, Morris told Wood, "FYI – what a cluster when you order BIBs so you can win an incentive." (Def. B. at 26; Wood Decl. ¶ 13, ECF No. 23-3.)

On February 19, Ms. Mead sent another email to Ms. Morris, noting that, in addition to the DPSG BIB that had been ordered for the Black Diamond Lounge, DPSG BIB had been ordered for the Gift Shop and was sitting in the warehouse. (Def. Ex. H at 23, ECF No. 23-8; Wood Decl. ¶ 16, ECF No. 23-3.) Morris responded, copying Witzke, Wood, Goslee, and others, and explained again that Silicato had special ordered this BIB for the Gift Shop. (Def. Ex. B at 30, ECF No. 23-2.) Mead then expressed her ongoing confusion about the Order given that Silicato had ordered BIB for the Black Diamond Lounge and the Gift Shop, accounts for which she was responsible. (*Id.* at 29.)

In response, Ms. Morris forwarded to Ms. Mead the Order placed by Silicato. (*Id.* at 34-35.) Mead thanked Morris for the clarification and said that she would address the situation with her "bosses," asserting that "[t]his was just a confusion of cluster." (*Id.* at 34.) Morris forwarded the email to Witzke, Goslee, Wood, and others, stating "What a fiasco." (*Id.* at 33.) Plaintiff did not respond to any of these emails. (Pl. Dep. at 62-63, 72-73, ECF No. 23-7.)

Mr. Wood forwarded the emails to Mr. Tull, and they discussed the situation. (Tull Decl. ¶¶ 41-42, ECF No. 23-2; *id.* at 29-35; Wood Decl. ¶¶ 17-19, ECF No. 23-3.) Specifically, Wood stated, "It appears the situation is blowing up! All over an incentive. BTW, I am waiting to see if David or Scott reply to the emails." (Def. Ex. H at 40, ECF No. 23-8; Wood Decl. ¶¶ 17-18, ECF No. 23-3.) At Tull's suggestion, the emails were sent to Mr. Quirk, who shared their concerns. (Tull Decl. ¶ 43, ECF No. 23-2; *id.* at 45; Quirk Decl. ¶¶

8-9, ECF No. 23-4; Wood Decl. ¶ 19, ECF No. 23-3.) Ms. Niver, PBV's highest ranking HR representative, was also informed of the situation. (Quirk Decl. ¶ 10, ECF No. 23-4; Niver Decl. ¶¶ 5, 9-10, ECF No. 23-6.)

On or about February 26, 2016, Mr. Goslee reviewed with Plaintiff the sales data related to the Harrington accounts "to confirm the addition of fountain in those locations." (Tull Decl. ¶ 46, ECF No. 23-2; *id.* at 51; Quirk Decl. ¶ 12, ECF No. 23-4; Wood Decl. ¶ 22, ECF No. 23-3.) Plaintiff did not tell Goslee to disregard the new Harrington valve placement data in connection with the incentive award. (Pl. Dep. at 66-67, 73-75, ECF No. 23-7; Goslee Decl. ¶¶ 11-12, ECF No. 23-5.) On February 26, 2016, Goslee reported to Wood and Tull that Plaintiff had reviewed the chart and had made no correction to the Harrington data, thereby seeking to take credit for new valve placements. (Tull Decl. ¶ 47, ECF No. 23-2; Wood Decl. ¶ 23, ECF No. 23-3; Goslee Decl. ¶¶ 11-13, ECF No. 23-5.)

Mr. Wood, Mr. Quirk, Mr. Tull, and Ms. Niver discussed the situation and agreed to question Mr. Witzke and suspend his employment with pay as PBV completed its investigation. (Tull Decl. ¶ 48, ECF No. 23-2; Niver Decl. ¶ 11, ECF No. 23-6; Quirk Decl. ¶ 14, ECF No. 23-4; Wood Decl. ¶ 24, ECF No. 23-3.) Goslee, Wood, and Tull then met with Mr. Witzke, and Mr. Witzke admitted that he was trying to win the incentive award and explained that he did not believe that he had done anything wrong because the Order had been placed by Silicato, not him. (Pl. Dep. at 76-80, ECF No. 23-7; Tull Decl. ¶ 49, ECF No. 23-2; Wood Decl. ¶ 25, ECF No. 23-3; Goslee Decl. ¶ 13, ECF No. 23-5.)

After the meeting with Plaintiff, Wood, Tull, and Goslee called Quirk and Niver to discuss the situation. (Tull Decl. ¶ 50, ECF No. 23-2; Niver Decl. ¶ 12, Def. F; Quirk Decl. ¶

15, ECF No. 23-4; Wood Decl. ¶ 26, ECF No. 23-3; Goslee Decl. ¶ 14, ECF No. 23-5.) Each of them attests that, after considering the emails and other information related to Mr. Witzke's conduct, as well as the response provided by Mr. Witzke, they believed, *inter alia*, that Mr. Witzke had "attempted to personally benefit from the fraudulent Order to the detriment of his co-workers." (Tull Decl. ¶ 51, ECF No. 23-2; Niver Decl. ¶ 13, ECF No. 23-6; Quirk Decl. ¶ 16, ECF No. 23-4; Wood Decl. ¶ 27, ECF No. 23-3; *see* Goslee Decl. ¶ 14, ECF No. 23-5.) Based on their investigation, they all agreed that Mr. Witzke's PBV employment should be terminated. (Tull Decl. ¶ 52, ECF No. 23-2; Niver Decl. ¶ 14, ECF No. 23-6; Quirk Decl. ¶ 17, ECF No. 23-4; Wood Decl. ¶ 28, ECF No. 23-3; Goslee Decl. ¶ 14, ECF No. 23-5.) On February 29, 2016, Mr. Witzke was informed of the termination decision. (Pl. Dep. at 80-85, ECF No. 23-7; Tull Decl. ¶ 56, ECF No. 23-2.) Mr. Witzke was 50 years of age at the time of his termination. (Pl. Dep. at 84, ECF No. 23-7.) PBV does not dispute that it billed for, accepted, and kept payment for the Order. (*See* Def. Ex. H at 27, ECF No. 23-8; Def.'s Reply at 13, ECF No. 29.)

## V.  PBV Fills Plaintiff's Position

On March 1, 2016, PBV internally posted the vacant FSR position previously held by Mr. Witzke. (Tull Decl. ¶ 59, ECF No. 23-2.) Three current PBV employees applied for this vacant FSR position: (i) Chris Smith (born 1976), (ii) Colin Brittingham (born 1990), and (iii) Alexander Rohoman (born 1989). (Tull Decl. ¶ 59, ECF No. 23-2.) PBV interviewed Mr. Smith and Mr. Brittingham, and Mr. Goslee selected Smith, the oldest of the three applicants, for the FSR position. (Goslee Decl. ¶ 19, ECF No. 23-5; Tull Decl. ¶ 60, ECF No. 23-2.) Before Smith assumed that FSR position, however, Goslee resigned, leaving the Food Service Director position vacant. (Tull Decl. ¶ 61, ECF No. 23-2; Pl. Dep. at 148-49,

ECF No. 23-7.) PBV then selected current PBV employee Edward Morris (born 1963) to fill

Mr. Goslee's position, leaving Mr. Morris's Account Development Representative ("ADR")

position vacant. (Tull Decl. ¶ 62; Pl. Dep. At 150.) Smith then was selected to fill the ADR

position[2] vacated by Mr. Morris. (Tull Decl. ¶ 63, ECF No. 23-2.) PBV then selected

Brittingham to fill the FSR position Smith initially had been selected to fill, and Brittingham

assumed the FSR position, effective May 22, 2016. (Tull Decl. ¶¶ 64-65, ECF No. 23-2.)[3]

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A

material fact is one that "might affect the outcome of the suit under the governing law."

*Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248.

In responding to a properly supported motion for summary judgment, the

nonmoving party must identify specific facts showing that there is a genuine issue for trial.

*Id.* at 256 (citing Fed. R. Civ. P. 56(e)). These facts need not *be* in admissible form, but rather

must be facts that *could be* put in admissible form. *Mallik v. Sebelius*, 964 F. Supp. 2d 531, 546

(D. Md. 2013) (explaining the effect of Fed. R. Civ. P. 56(c)(2)). The burden to identify

specific facts is "particularly strong" where the nonmoving party also bears the burden of

---

[2] Mr. Tull has attested that "[a]n ADR, like an FSR, has sales responsibilities, but it is a higher level position." (Tull Decl. ¶ 13, ECF No. 23-2.)

[3] Additional facts, where relevant, are discussed below.

proof at trial. *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995). The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in h[is] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but evidence that is merely colorable or is not significantly probative is not sufficient. *Anderson*, 477 U.S. at 249. Summary judgment is appropriate if the evidence is "so one-sided that one party must prevail as a matter of law." *Id.* at 252. In the Fourth Circuit, trial courts have an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th. Cir. 2003).

## DISCUSSION

The ADEA prohibits intentional discrimination because of age. 29 U.S.C. § 623(a)(i). To avert summary judgment, a plaintiff may use either of two methods of proof: (i) direct or circumstantial evidence that discrimination motivated the adverse decision, or (ii) evidence that the defendant's articulated reason for the decision at issue was merely a "pretext" for discrimination. *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284-86 (4th Cir. 2004) (*en banc*), *abrogated on other grounds by Univ. of Texas SW Med. Ctr. v. Nassar*, __U.S.__, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013). Under either approach, "the ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Id.* at 286 (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153, 120 S. Ct. 2097, 2111, 147 L. Ed. 2d 105, 123 (2000)). To demonstrate such an intent under the ADEA in a termination case, the plaintiff must prove that, but for his age, his employment would not have been terminated. *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176, 129 S. Ct. 2343, 2350, 174 L. Ed. 2d 119 (2009); *see also Arthur v. Pet*

*Dairy*, 593 Fed. App'x 211, 216 (4th Cir. 2015) (*per curiam*) (noting the "elevated" burden of proof under the ADEA). The Defendant contends that Plaintiff has failed under both methods of proof to demonstrate the evidence warrants a trial in this case.

**I.    Direct or Circumstantial Proof of Discriminatory Motive**

To establish that his termination was motivated by age discrimination, a plaintiff must prove that a biased employee "in reality ma[de] the decision," not "merely influence[d] the decision." *Hill*, 354 F.3d at 291. Accordingly, a plaintiff must produce sufficient evidence to establish that the co-worker "possessed such authority as to be viewed as the one principally responsible for the decision or the actual decision maker." *Id.* Direct evidence requires "'conduct or statements' that both (1) 'reflect directly the alleged discriminatory attitude,' and (2) 'bear directly on the contested employment decision.'" *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (citation omitted). Stray comments unrelated to the challenged decision are not sufficient evidence to support a discrimination claim. *O'Connor v. Consol. Coin Caterers*, 56 F.3d 542, 548-49 (4th Cir. 1995) (holding that the following "stray" statements were not evidence of age discrimination: (i) it's "about time we got some young blood" made two days before discharge, (ii) "you are too damn old" made two weeks before discharge, and (iii) you are "too old" made a month before discharge), *rev'd on other grounds*, 517 U.S. 308, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996);[4] *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 512 (4th Cir. 1994) (holding that statement by decision maker that "there comes a time when we have to make way for younger people" was not evidence of age discrimination).

---

[4] Upon remand, the Fourth Circuit stated that these holdings continued to apply with "with equal force." *O'Connor v. Consol. Coin Caterers Corp.*, 84 F.3d 718, 720 (4th Cir. 1996).

Comments about age often do not "carry the same animus as those about race or gender" because "barring unfortunate events, everyone will enter the protected age group at some point in their lives." *Birkbeck*, 30 F.3d at 512. Age-based comments that merely reflect "a fact of life" are "truisms" that cannot establish a discrimination claim. *Id.*; *see also Mereish v. Walker*, 359 F.3d 330, 336-37 (4th Cir. 2004) ("[W]e have consistently held, along with other circuits, that general or ambiguous remarks referring to the process of generational change create no viable issue of age discrimination"); *Dockins v. Benchmark Commc'ns*, 176 F.3d 745, 749 (4th Cir. 1999) ("Stating a fact of life does not make one an age bigot."). Furthermore, age-based comments made by co-workers within the protected class or made in connection with a birthday may not be sufficient to establish a claim of age discrimination. *See, e.g.*, *Birkbeck*, 30 F.3d at 512 (statement made by 52 year old manager who "was himself in the protected category" about 55 and 62 year old employees created no inference of age discrimination); *O'Connor*, 56 F.3d at 549 (statement that it was time "we get some young blood in the company," made in connection with plaintiff's impending fiftieth birthday, was a non-actionable "humorous" and "innocuous" statement).

In this case, Mr. Witzke points to four types of evidence in an effort to establish that age discrimination motivated his termination: (i) alleged ageist comments by Mr. Goslee, (ii) his reported health issues, (iii) the implementation of CRM software, and (iv) PBV's alleged effort to foster "youth culture" through "frat-like" behavior.

## A. Comments by Goslee

Plaintiff points to Mr. Goslee's comment on June 18, 2015 that he "had a lot of grey hair in the department" and "feels they are becoming complacent." (Pl. Dep. at 91-93, ECF

No. 23-7; Pl. Ans. to Interrog. No. 10, ECF No. 26-13.) Plaintiff also highlights Goslee's remark on September 24, 2015, shortly after Plaintiff's birthday, that Plaintiff "was beginning to look weathered." (Pl. Dep. at 94-96; Pl. Ans. to Interrog. No. 10, ECF No. 26-13.) It is undisputed, however, that Mr. Goslee's opinion had no bearing on the ultimate decision to terminate Plaintiff. Plaintiff has not contested the statements by Tull, Wood, Quirk, and Niver that they had decided to terminate even if Mr. Goslee disagreed. (Tull Decl. ¶ 55, ECF No. 23-2; Wood Decl. ¶ 31, ECF No. 23-3; Quirk Decl. ¶ 20, ECF No. 23-4; Niver Decl. ¶ 17, ECF No. 23-6.) Mr. Goslee was therefore not a decision maker, so Plaintiff cannot rely on Goslee's statements as direct evidence that age discrimination motivated PBV's termination decision. *Hill*, 354 F.3d at 291.

Even if there were a genuine dispute as to whether Mr. Goslee was principally responsible for the decision, these statements were made many months before termination decision, which undermines any nexus between the statements and the employment action. *O'Connor*, 56 F.3d at 548-49. Additionally, Plaintiff has not produced evidence regarding the circumstances of the remarks by Goslee, who is older than Plaintiff, that would enable a reasonable jury to infer that his remarks were anything more than innocuous or humorous statements. *O'Connor*, 56 F.3d at 549.[5]

### B. Reported Health Issues

Turning to Mr. Witzke's reported health issues related to abdominal lumps, he has

---

[5] Plaintiff has also pointed to comments by Mr. Goslee in Plaintiff's annual performance evaluations. Specifically, in both 2013 and 2014, Mr. Goslee wrote that Mr. Witzke "needs to work on looking for opportunities in current accounts for new distribution and equipment all of this is based on our current economic climate and the influx of national food chains." (Pl. Ex. 1(a) at 14, ECF No. 26-4; Pl. Ex. 1, ECF No. 26-2 at 42.) Plaintiff contends that these comments reinforced his subjective concern that his job was in jeopardy based on his age. (Witzke Aff. ¶ 5, ECF No. 26-9; Resp. at 8-9, ECF No. 25.) These comments, however, evince no bias by Mr. Goslee, and Mr. Witzke's *subjective* assessment of his job security is irrelevant. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

not offered any evidence that the decision makers, Mr. Tull, Mr. Wood, Mr. Quirk, and Ms. Niver, ever learned of this health condition. Mere awareness by Mr. Goslee, who was not a decision maker, of the issue does not establish discriminatory intent. *See, e.g., Dockins*, 176 F.3d at 749 (concluding that while "[h]ealth problems do increase with age . . . such statements [about health problems] seem only truisms [and do not] indicate a discriminatory purpose"). Indeed, Plaintiff has failed to point to any evidence that this health issues, including any potential absences or performance disruptions, were noteworthy in any way to PBV.

## C. Customer Relationship Management Software

Regarding PBV's Customer Relationship Management ("CRM") software, Plaintiff argues that PBV's fall 2015 implementation of this software indicates the company's intent to discriminate against its employees based on age. Plaintiff points to his own report that PBV employee Lindsay Weems said the purpose of the program was to "harvest the tribal knowledge of *older* employees who will be leaving the company." (Pl. Dep. at 97-99, 104, ECF No. 23-7 (emphasis added); Pl. Compl. ¶ 12, ECF No. 1; Pl. Ans. to Interrog. No. 11, ECF No. 26-13; *see also* Quirk Decl. ¶ 27-29, ECF No. 23-4.) Plaintiff also points to Defendant's admission that since the CRM system was implemented in 2015, "more than one PBV employee under the age of 40 in the Northern Division has replaced a PBV employee over the age of 40 in the Northern Division whose employment by PBV ended." (Def. Ans. to Admiss. No. 17, ECF No. 26-15.) At the same time, Plaintiff has conceded that *all* on premise PBV employees, regardless of age, were expected to use CRM (Pl. Dep. at 103, ECF No. 23-7; Quirk Decl. ¶¶ 32-33, ECF No. 23-4) and that the goal was to harvest

the knowledge of "*any* employees that left." (Pl. Dep. at 104-05, ECF No. 23-7)(emphasis added). Plaintiff also observed that employees over 40 would have more information to harvest. (*Id.*)

Plaintiff's factual concessions alone eliminate any reasonable connection between PBV's CRM system and discriminatory intent. Even his comment that older employees likely have more information to offer merely recognizes a factual truism. *Birkbeck*, 30 F.3d at 512. The CRM evidence therefore fails to either "reflect directly the alleged discriminatory attitude" or speak "directly on the contested employment decision." *Laing*, 703 F.3d at 717.

### D. PBV's "Youth Culture"

The parties devote significant briefing to the issue of whether PBV is imposing a "youth culture" upon its employees. This issue centers on the conduct of Mr. Quirk and Ms. Niver at an event at a restaurant in fall 2014 and an event at a separate restaurant in 2015. Both restaurants were PBV customers at the time. In the first instance, Plaintiff, who did not attend the fall 2014 event, alleges that Quirk and Niver each had "at least two" drinks while on the job (Pl. Dep. at 112, ECF No. 23-7), and the Defendant points to the Declarations by Mr. Quirk, Ms. Niver, and Mr. Tull indicating that neither Mr. Quirk nor Ms. Niver finished even a single drink (Quirk Decl. ¶ 37, ECF No. 23-4; Niver Decl. ¶ 26, ECF No. 23-6; Tull Decl. ¶ 88, ECF No. 23-2). As for the second event, Plaintiff states that he saw Quirk consume one alcoholic drink while on the job at the event. (Pl. Dep. at 130-33.)

Even if there exists a genuine dispute over how much alcohol Quirk and Niver consumed—and whether such consumption violated company policy—this dispute is not material to Plaintiff's claim of age discrimination. Plaintiff's string of inferences begins by

characterizing Quirk and Niver's alcohol consumption as "frat-like" behavior and then uses that characterization as evidence of a "youth culture," which Plaintiff claims demonstrates that PBV intentionally discriminated against him in February 2016. The imaginative metaphorical leaps required to construct this argument, based on two isolated events prior to 2016, are unfounded and insufficient to generate a reasonable inference of discrimination. This evidence therefore fails to either "reflect directly the alleged discriminatory attitude" or speak "directly on the contested employment decision." *Laing*, 703 F.3d at 717. Accordingly, under the first method of proof, Plaintiff has failed to point this Court to any direct or circumstantial evidence showing that PBV's termination decision was motived by a discriminatory bias against older employees.

## II.    Evidence of Pretext

Having found that Plaintiff's claim may not proceed under the first method of proof, this Court now turns to Plaintiff's effort to prove discrimination by showing that Defendant's purported reasoning was pretextual. This method of proof involves a three-step burden-shifting approach that was initially laid out in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973). First, the plaintiff must make out a *prima facie* case of age discrimination by demonstrating that: "(1) he is a member of the protected class; (2) he was qualified for the job and met [the employer's] legitimate expectations; (3) he was discharged despite his qualifications and performance; and (4) following his discharge, he was replaced by a substantially younger individual with comparable qualifications." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006) (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-13, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *Causey v. Balog*, 162 F.3d 795, 802 & n.3 (4th Cir. 1998)).

If the plaintiff carries this burden, "he creates a presumption of discrimination, and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment decision." *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *McDonnell Douglas*, 411 U.S. at 802–03). If the defendant articulates such a reason, "the presumption disappears and the plaintiff must show that the articulated reason is a pretext for age discrimination." *Id.* (citations omitted); *see also Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995), *as amended* (June 9, 1995), *as amended* (Mar. 14, 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 2746–49 (1993)) (noting that the "the presumption created by the *prima facie* case 'drops out of the picture,'" when a defendant articulates a nondiscriminatory reason). A plaintiff may establish that the employer's articulated reason is mere pretext "either by showing that the [employer's] explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of . . . [the] discrimination." *Mereish v Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

## A. Plaintiff's Proffer of a Prima Facie Case

Defendant contends that Plaintiff, by admitting to certain conduct related to the Harrington Order, has failed to show that he was "qualified for the job and met [PBV's] legitimate expectations." *Warch*, 435 F.3d at 513. The Fourth Circuit has held that a plaintiff fails to establish this prima facie element if he admits to "the work performance and rules infractions that led to [his] termination." *Hill*, 354 F.3d at 298; *see also Moody v. Arc of Howard*

*Cnty., Inc.,* Civil No. JKB-09-3228, 2011 WL 2297676, *4 (D. Md. June 8, 2011) (holding that third element of *prima facie* case "cannot be established if the plaintiff admits to the performance or conduct problems that led to his discharge"). Additionally, it is "the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (quoting *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir.1996)).

Defendant argues that Plaintiff has admitted to certain facts indicating that he played a role in the placement of "a fraudulent Order." (ECF No. 23-1 at 23.)[6] As an initial matter, Plaintiff does not appear to have admitted the Order was "fraudulent" – that term appears to derive from the decision maker's Declarations. (Tull Decl. ¶ 51, ECF No. 23-2; Wood Decl. ¶ 27, ECF No. 23-3; Quirk Decl. ¶ 16, ECF No. 23-4; Niver Decl. ¶ 13, ECF No. 23-6.) Mr. Witzke nonetheless has admitted that he told Silicato about the DPSG incentive program, including that "adding new valve placements would benefit [Mr. Witzke]." (Pl. Dep. at 67-68, 78, ECF No. 23-7.) Plaintiff has also admitted that when Ms. Morris, PBV's Distribution Manager, raised questions about the "strange" Order, Plaintiff told her to proceed. (Pl. Dep. at 50-51, 70-72, ECF No. 23-7; Def. Ex. H at 17, ECF No. 23-8.) Similarly, Mr. Witzke admits that when Ms. Mead, Promotions Supervisor at Harrington, raised concerns about the Order, he said nothing. (Pl. Dep. at 62-63, Def. Ex G.) Mr. Witzke acknowledges that the Order suggests Harrington added a new DPSG valve placement, which would benefit Mr. Witzke in the sale incentive program. (*Id.* at 51, 78.) Mr. Witzke admits that when Mr. Goslee asked him about the new valve placement data, including the data based on the strange Order from Harrington, Mr. Witzke did not say that the

[6] Citations to pages in the Defendant's brief are to the document's *internal* numbering, not the ECF-generated stamps.

18

Harrington data should be disregarded for the purpose of the incentive program. (*Id.* at 66-67, 73-75.) Rather, Mr. Witzke "assum[ed] . . . that they had added a few valves on with the idea of helping me," and told Mr. Goslee, "I don't place the orders at Harrington." (*Id.* at 67.)

Plaintiff points this Court to years of positive performance evaluations (Pl. Ex. 1, ECF Nos. 26-1 to 26-3), but those evaluations fail to establish a genuine dispute that the PBV decision makers *perceived* that his conduct related to the Harrington Order was fraudulent and failed to meet their expectations. *King*, 328 F.3d at 149. Specifically, PBV's decision makers uniformly attest:

> After considering the emails and other information related to Mr. Witzke's conduct, as well as the response provided by Mr. Witzke, we believed that: (i) Mr. Witzke had induced a customer (Mr. Silicato) to submit a fraudulent product order in an effort to help Mr. Witzke win an incentive award, (ii) when a co-worker (Ms. Morris) and a customer representative (Ms. Mead) brought the fraudulent order to the attention of Mr. Witzke, he took no steps to address the issue and, instead, encouraged the co-worker to process the fraudulent order, (iii) Mr. Witzke failed to correct a report that inaccurately attributed new valve placements based on the fraudulent order, which constituted the falsification of records, (iv) Mr. Witzke attempted to personally benefit from the fraudulent order to the detriment of his co-workers, and (v) Mr. Witzke had failed to comply with company policy and conduct expectations.

(Tull Decl. ¶ 51, ECF No. 23-2; Wood Decl. ¶ 27, ECF No. 23-3; Quirk Decl. ¶ 16, ECF No. 23-4; Niver Decl. ¶ 13, ECF No. 23-6.) Having admitted to the conduct that PBV perceived to be fraudulent, there is no genuine dispute that Plaintiff has failed to establish that he was meeting PBV's legitimate expectations at the time he was fired. *Hill,* 354 F.3d at 298; *King*, 328 F.3d at 149; *Moody,* 2011 WL 2297676, *4. This failure is fatal to Plaintiff's

attempt to prove age discrimination through the *McDonnell Douglass* framework, and summary judgment shall accordingly be granted in Defendant's favor.

## B. The Harrington Order as Pretext for Age Discrimination

Alternatively, even if there were a genuine dispute as to Plaintiff's prima facie case, the Plaintiff has failed to establish a genuine dispute as to whether PBV's reasoning was pretextual. The next step in the burden-shifting approach is for the Defendant to articulate a legitimate, non-discriminatory reason for the termination. *Laber,* 438 F.3d at 430. PBV has explained that the termination was based on PBV's belief that Plaintiff attempted to take credit for a questionable Harrington Order as part of his effort to win a trip to Las Vegas. (Tull Decl. ¶ 58, ECF No. 23-2.). Plaintiff does not contend that the defendant's articulated reason, if true, is not "legitimate" and "non-discriminatory." Rather, he moves on to the next step in the analysis to argue that this reason is false. ). In order to succeed, Plaintiff must either show that "the [employer's] explanation is unworthy of credence" or offer "other forms of circumstantial evidence sufficiently probative of . . . [the] discrimination." *Mereish*, 359 F.3d at 336 (internal quotations and citations omitted).

Plaintiff's direct attack on the reasoning for PBV's termination decision is that (1) his conduct was not in fact "fraudulent," (2) PBV's explanation changed over time, (3) and the decision ignored the company's usual "Progressive Discipline Policy." He also points to other forms of circumstantial evidence, such as comparators, that are allegedly probative of discrimination.

### 1. Disagreement with Conclusion of Fraud

In assessing a direct attack on the credibility of an employer's explanation, the Court may not substitute its own judgment, or that of the Plaintiff, in place of the employer's

judgment. *See, e.g., DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (holding that it is not a court's "province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination."); *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217-18 (4th Cir. 2007) (affirming summary judgment for employer because plaintiff employee had failed to establish evidence that the decision maker did not "honestly believe" the reasons for the adverse action).

In challenging PBV's conclusion that the Order was "fraudulent," Plaintiff argues that (a) PBV kept Harrington's payment for the Order (*see* Def. Ex. H at 27, ECF No. 23-8; Def Resp. Admiss. No. 22-23, ECF No. 26-15)[7] and that (b) the DPSG incentive program was designed to encourage the very tactics Plaintiff employed (*see* Pl. Dep. at 68, ECF No. 23-7; Tull Decl. ¶¶ 15, 18, ECF No. 23-2). Regarding Harrington's ultimate use of the product and PBV's recognition of the sale, Plaintiff has ignored that PBV believed he was defrauding not Harrington but PBV and his co-workers by seeking credit for new valve placements that did not exist. (*See* Tull Decl. ¶ 51, ECF No. 23-2; Wood Decl. ¶ 27, ECF No. 23-3; Quirk Decl. ¶ 16, ECF No. 23-4; Niver Decl. ¶ 13, ECF No. 23-6.)

As for the purpose of the sales incentive program, Plaintiff may very well be correct that PBV wanted its salespersons to induce customers to order products that they may not need, but the evidence shows that the decision makers were nonetheless troubled by Plaintiff's conduct throughout the transaction and subsequent investigation by PBV. Specifically, Ms. Mead, writing on behalf of PBV's client Harrington, told Ms. Morris, "This

---

[7] Defendant's Exhibit H contains an email by Ms. Morris stating, "It sounds like she realizes that her invoices were correct now and will take up with her bosses the added product on who will get charged what." (Def. Ex. H at 27, ECF No. 23-8.)

was just a confusion of cluster." (Def. Ex. B at 34, ECF No. 23-2.) Ms. Morris then forwarded this email to Witzke, Goslee, Wood, and others, and Wood then forwarded it to Tull. (*Id.* at 33-34.) In another email to Morris, Witzske, Goslee, Wood, and others, Ms. Mead puzzles, "But I am not sure why DJ ordered for the lounge because he does not order for the lounge?? . . . [The BIBS] need to be charged to him and not the gift shop." (*Id.* at 29-30.)[8] Additionally, when forwarding one of Mead's emails to Witzke, Goslee, Wood, and others, Sandy Morris said, "What a fiasco." (*Id.* at 33.) Ms. Morris also emailed Mr. Wood saying, "What a cluster when you order BIB's so you can win an incentive." (Ex. H at 20, ECF No. 23-8; Wood Decl. ¶ 13, ECF No 23-3.) Furthermore, Wood emailed Mr. Tull saying, "It appears the situation is blowing up! All over an incentive. BTW, I am waiting to see if David or Scott [Witzke] reply to the emails."(Def. Ex. B at 40, ECF No. 23-2; Wood Decl. ¶ 18, ECF No. 23-3.) Plaintiff never responded to any of these emails. (Pl. Dep. at 62-63, 72-73, ECF No. 23-7.). Based on the emails and Plaintiff's conduct, Tull, Wood, Quirk, and Niver uniformly state that they concluded:

> (i) Mr. Witzke had induced a customer (Mr. Silicato) to submit a fraudulent product order in an effort to help Mr. Witzke win an incentive award, (ii) when a co-worker (Ms. Morris) and a customer representative (Ms. Mead) brought the fraudulent order to the attention of Mr. Witzke, he took no steps to address the issue and, instead, encouraged the co-worker to process the fraudulent order, (iii) Mr. Witzke failed to correct a report that inaccurately attributed new valve placements based on the fraudulent order, which constituted the falsification of records, (iv) Mr. Witzke attempted to personally benefit from the fraudulent order to the detriment of his co-workers, and (v) Mr. Witzke had failed to comply with company policy and conduct expectations.

---

[8] Defendant has also pointed to statements by a Harrington employee made *after* Plaintiff's termination (*see* ECF No. 23-1 at 10), but these statements cannot be offered to prove PBV's knowledge and intent, which was formed and executed prior to PBV receiving those statements.

(Tull Decl. ¶ 51, ECF No. 23-2; Wood Decl. ¶ 27, ECF No. 23-3; Quirk Decl. ¶ 16, ECF No. 23-4; Niver Decl. ¶ 13, ECF No. 23-6.)

This Court is not tasked with approving PBV's analysis of Mr. Witzke's conduct, but it must consider whether Plaintiff has established a genuine dispute as to PBV's "honest belief." *Holland*, 487 F.3d at 217-18; *accord. DeJarnette*, 133 F.3d at 299. PBV's acceptance of Harrington's payment and the usual nature of sale incentive programs do not directly address PBV's detailed conclusions based on the email discussions and PBV's internal investigation.[9] This evidence therefore fails to generate a genuine dispute of material fact.

### 2. PBV's Various Explanations

Plaintiff's next argument is that PBV has advanced inconsistent reasons for his termination. First, he claims that PBV told the Maryland Department of Labor that Plaintiff was discharged "for failing to correct a mistaken product order." (Pl. Ex. 7, ECF No. 26-11.) Second, Plaintiff claims that PBV informed the federal Equal Employment Opportunity Commission ("EEOC") that Plaintiff was fired because PBV concluded that Mr. Witzke "falsif[ied] company documents." (Pl. Ex. 6 at 3, ECF No. 26-10.) The Defendant argues that these alleged statements have been mischaracterized. (ECF No. 23-1 at 29.)

Even if there is a factual dispute as to whether PBV made these representations, the statements are entirely consistent with the decision makers' detailed list of conclusions. (Tull Decl. ¶ 51, ECF No. 23-2; Wood Decl. ¶ 27, ECF No. 23-3; Quirk Decl. ¶ 16, ECF No. 23-4; Niver Decl. ¶ 13, ECF No. 23-6.) These statements therefore do not constitute evidence

---

[9] Plaintiff also complains that PBV did not, in addition to reviewing the emails from Harrington, conduct *external* interviews with its client's employees (ECF No. 25 at 12), but Plaintiff has failed to explain how this decision tends to prove PBV did not honestly believe Plaintiff's conduct was deficient.

that in any way undermines PBV's honest belief that Plaintiff's conduct warranted termination.

### 3. Progressive Discipline Policy

Plaintiff also advances PBV's "Progressive Discipline Policy" as evidence that PBV's reasoning is pretextual. Plaintiff contends that PBV departed from its "Three Strike Rule" when terminating him. (ECF No. 25 at 19; Def. Ex. F at 20, ECF No. 23-6; Pl. Dep. at 24, ECF No. 23-7.) It is undisputed, however, that the PBV policies explicitly state that *progressive* corrective action is *not* promised and that employment is *at-will* and can be terminated *immediately* without prior notice or warning. (Pl. Dep. at 21-26, ECF No. 23-7; Def. Ex. H at 6-12, ECF No. 23-8; Niver Decl. ¶ 8, ECF No. 23-6; *id.* at 18.) Accordingly, the fact that PBV terminated Plaintiff's employment without prior warning is not evidence that PBV's reasoning is unworthy of credence. *Mereish*, 359 F.3d at 336.

### 4. Other Circumstantial Evidence

Beyond the purported direct and circumstantial evidence already addressed as insufficient under the first method of proof, Plaintiff contends that ten other employees were treated better than him based on their age. In order to support a claim of discrimination, comparator evidence generally must show that other (substantially younger employees)[10] are similarly situated and treated differently. *See, e.g.*, *DeJarnette*, 133 F.3d at 298; *Lightner v. City of Wilmington*, 545 F.3d 260, 264-65 (4th Cir. 2008) (holding that the "similarity between the comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful").

---

[10] Under *Warch v. Ohio Cas. Ins. Co.*, the proper comparison in age discrimination claims is not to individuals outside "the protected class," but to individuals "substantially younger." 435 F.3d at 513.

Plaintiff primarily points to PBV's treatment of Colin Brittingham (born 1990), who filled the FSR position left vacant by Chris Smith, as evidence of discrimination. Plaintiff notes that Mr. Brittingham was *not* terminated despite tardiness, missing appointments, and initially trying to deceive Smith regarding whether Brittingham had attended a baseball with a PBV customer. (Tull Decl. ¶¶ 66-68, ECF No. 23-2.) Plaintiff also points to a statement by Daryl Gregory, a former PBV salesman, that PBV suspected Mr. Brittingham "misrepresented his qualifications when applying for his position." (Gregory Aff. ¶ 41, ECF No. 26-8.) To quickly address this alleged suspicion, Plaintiff's brief claims that PBV "ultimately discovered" this suspicion to be true (ECF No. 25 at 17), but Gregory's Affidavit merely says that PBV "conducted an investigation" (Gregory Aff. ¶ 41, ECF No. 26-8). Mr. Gregory, whose personal knowledge of these alleged facts is not apparent, never states whether that investigation ever came to a conclusion. At this stage, only speculation could fill that evidentiary gap.

Regarding the remainder of Mr. Brittingham's unprofessional conduct, Defendant points to the Declaration by Mr. Tull, the HR Manager for the Northern Division, stating that Brittingham:

> (i) never has induced, been accused of inducing, or has been believed to have induced a customer to submit a fraudulent order to help him win a sales incentive, (ii) never has been confronted with a fraudulent order, and then failed to intervene, (iii) never was asked to confirm the accuracy of sales data that he knew was not accurate, and then failed to correct the inaccuracy, (iv) never has failed to admit misconduct when confronted with evidence of such misconduct, (v) never has represented that inaccurate sales data was accurate, and (vi) never has knowingly attempted to personally benefit from a fraudulent order to the detriment of his co-workers.

(Tull Decl. ¶ 69, ECF No. 23-2.) Defendant also notes that PBV identified one former sales employee in a different territory who engaged in misconduct to win an incentive award, and that employee, just like Plaintiff, was discharged. (Niver Decl. ¶ 22, ECF No. 23-6.) Upon this record, there is no genuine dispute that Plaintiff has failed to "clearly establish" that the "seriousness" of Mr. Brittingham's unprofessional conduct is sufficiently similar to Mr. Witzke's. *Lightner*, 545 F.3d at 264-65. Most directly, Mr. Brittingham's initial lie and subsequent confession about his attendance at a baseball game falls far short of Mr. Witzke's attempt to use inaccurate data to win a trip to Las Vegas.

Plaintiff has identified nine additional employees who were allegedly treated better than him due to age. (*See* ECF No 25 at 21-24; Pl. Ans. to Interrog. No. 16, ECF No. 26-13; Pl. Dep. at 151-76, ECF No. 23-7.) None of these individuals held an FSR position or engaged in conduct similar to Mr. Witzke. (*See* Tull Decl. ¶¶ 72-80, ECF No. 23-2; Pl. Dep. at 151-76, ECF No. 23-7.)[11]

Plaintiff's brief contains another stray allegation that Mr. Goslee resigned "due to [n]ot recognizing the true intent of one of my team members [Mr. Witzke's intention of trying to follow PBV policy]. . . ." (ECF No. 25 at 15.) In making this claim, however, Plaintiff provides no basis for its interpretation of Mr. Goslee's statement. (Goslee Decl. ¶ 18, ECF No. 23-5; *id.* at 5.) Furthermore, to the extent Plaintiff is arguing that Goslee believed the Harrington Order was a pretext for age discrimination, Goslee affirmatively

---

[11] In making comparisons, Plaintiff also points to the fact that "younger employees, such as the younger FSR's in the North Carolina Division" were not required to keep a Commercial Drivers License. (Pl. Dep. at 181-187, ECF No. 23-7.) This vague contention about employees in another division is "not significantly probative" and is therefore insufficient to generate a genuine dispute of material fact. *Anderson*, 477 U.S. at 249.

states, "Witzke's age was not a factor in the decision to terminate his employment." (Goslee Decl. ¶ 16, ECF No. 23-5.) This Court is not bound to adopt Plaintiff's baseless inference.

At bottom, neither this Court nor any federal trial jury should "sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with discrimination." *DeJarnette,* 133 F.3d at 298-99. While Mr. Witzke may disagree with PBV's assessment of his conduct related to the Harrington Order and the sales incentive program, the evidence supporting PBV's honest belief that Plaintiff's conduct warranted termination is so one-sided that no reasonable jury could conclude that PBV discriminated against Mr. Witzke. *Anderson*, 477 U.S. at 252. Plaintiff's lack of evidence is particularly stark under the elevated but-for causation requirement in age discrimination cases. *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176, 129 S. Ct. 2343, 2350 (2009); *Arthur v. Pet Dairy*, 593 Fed. App'x 211, 216 (4th Cir. 2015) (per curiam).

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Leave to File a Reply (ECF No. 33) is GRANTED, and Defendant's Motion for Summary Judgment (ECF No. 23) is GRANTED. Accordingly, Judgment shall be ENTERED in favor of the Defendant.

A separate Order follows.

Date: September 19, 2018               \_\_\_\_/s/_____
                                       Richard D. Bennett
                                       United States District Judge